UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,                )
                    Plaintiff,       )
                                        )          No. 1:19-cr-296
-v-                                      )
                                        )          Honorable Paul L. Maloney
DANTE DEVON WHITLEY,                      )
                    Defendant.       )
_____  )

## OPINION

This matter is before the Court on Defendant Dante Devon Whitley's motion to suppress evidence obtained from a search of his car (ECF No. 24). The Court held a hearing on the motion on May 11, 2020. For the reasons to be explained, the Court will deny the motion.

## I.

On September 26, 2019, Kentwood Detective Jeffrey Woollam received information from a confidential informant about the sale of heroin at 5828 Ridgebrook Avenue in Kentwood, Michigan. Detective Woollam drove to that house and began conducting surveillance. While there, he saw Whitley leave the home with a "wad of cash" that Whitley appeared to be counting. Whitley got into a red Dodge Avenger and drove away; Detective Woollam followed. Whitley drove to a house down the street—5986 Ridgebrook—where he had a short interaction with a black male. The interaction took less than 30 seconds, and Detective Woollam did not see any transaction or exchange take place between the two men.

At that point, Detective Woollam called his partner, Kentwood Detective Scott Drumm, and told Detective Drumm what he had observed; Detective Drumm agreed to join the surveillance effort.

Detective Woollam followed Whitley from the second Ridgebrook home to a Family Dollar store. Detective Drumm had joined the surveillance in a separate car, and he observed Whitley "exit the Family Dollar, take a black bag out of the passenger side of the vehicle, and place it in the trunk of the vehicle." (ECF No. 24-1 at PageID.79). Leaving the Family Dollar, Detective Drumm observed the vehicle fail to stop at a private drive. Both officers followed Whitley as he drove through Kentwood and Grand Rapids, and maintained surveillance when he eventually arrived at the Mother Hubbard liquor store in Grand Rapids. Whitley entered the liquor store empty handed and came out empty handed. When he left Mother Hubbard, the detectives observed Whitley fail to stop as he exited the private drive and turned onto the main road.

Detective Woollam called nearby on-duty Kentwood Police Officer Turmell and asked him to conduct a traffic stop on Whitley based on his failures to stop at the two private drives.  Officer Turmell pulled Whitley over at 7:44 p.m. The detectives, who had been driving directly behind Officer Turmell, observed the stop but did not approach the car at first because they were in plain clothes. Before he got out of his vehicle, Detective Woollam also radioed to request a "dope" K9 unit for the traffic stop.

Officer Turmell walked up to Whitley's passenger-side door and explained the reason for the stop. He requested Whitley's driver's license, insurance, and registration, all of which Whitley provided without incident. Whitley was alone in the vehicle. Officer

Turmell noticed a digital scale on Whitley's lap and asked him about it. In response, Whitley stated that he "smokes weed," that he did not have any weed, and that he was on his way to buy weed. He also indicated that he used the scale when purchasing marijuana. Officer Turmell then returned to his police vehicle and spoke with the detectives, relaying Whitley's statements and stating that "he had a scale right there, right on his lap."

At that point, Detectives Woollam and Drumm approached Whitley's vehicle with Officer Turmell: Officer Turmell stood on the driver's side and had his hand on the driver's side door handle while Detective Woollam stood at the rear passenger side of the vehicle. At about 7:46 p.m., Officer Turmell asked Whitley to step out of the vehicle so that he could "investigate the scale real quick." Whitley replied that he "didn't commit no crime" and refused to exit the vehicle. Officer Turmell pressed, stating "we need to have a conversation back out here."

While this verbal exchange was happening, Detective Woollam walked forward to the passenger side of the vehicle with his hand on his firearm. Detective Woollam stated, "he asked you to step out of the car." The ensuing dialogue is overlapping and unclear on the audio tape, but Whitley continues to argue with the officers about the request to exit his vehicle. At 7:47 p.m., Detective Woollam states, "you're under arrest, do you understand that?"

Whitley and the officers continue to argue from 7:48 p.m. until about 8:02 p.m. The officers repeat their belief that they have a right to search the vehicle based on the scale, and

at some point, reference marijuana "shake."[1] Whitley repeated his belief that the scale and shake did not provide officers with the right to search his vehicle because Michigan has decriminalized marijuana possession. In the approximately 14 minutes that Whitley continued to refuse to exit the vehicle, multiple officers arrived on scene, including the requested K9 unit.

At 8:03 p.m., Whitley exited the vehicle of his own accord. The officers immediately arrested Whitley for resisting and obstructing a police officer in violation of MCL § 750.81(d)(1) and possession of drug paraphernalia in violation of Kentwood Compiled Ordinance § 38-353. Whitley did not resist arrest: he ultimately complied and provided a post-*Miranda*[2] statement admitting the essential elements of the charged offenses (unlawful transport of firearms, possession with intent to distribute marijuana, and possession of a firearm in furtherance of drug trafficking).

At about 8:07 p.m., a Wyoming Police Department K9 unit (Officer Daniel Sanderson and his canine Azar) conducted a sniff of the vehicle; the dog alerted positively for narcotics. The officers searched the vehicle and discovered ammunition, a Glock 19mm handgun with an extended magazine, over $7,600 in cash, a digital scale, and about a pound of marijuana in the black bag in the trunk.

Whitley now moves to suppress the evidence seized during the search of the car and the post-*Miranda* statements because he believes that the officers did not have probable cause to search the vehicle.

---

[1] Extremely small pieces of marijuana.
[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

4

## II.

The Fourth Amendment prohibits unreasonable searches and seizures. A warrantless search is presumptively unreasonable unless it falls within an established exception to the warrant requirement. *Mincey v. Arizona*, 437 U.S. 385, 390 (1978). If an unconstitutional search takes place, the exclusionary rule requires both "primary evidence obtained as a direct result of an illegal search of seizure" and "evidence later discovered and found to be derivative of an illegality" (commonly known as the "fruit of the poisonous tree") to be suppressed. *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984) (quotation marks omitted)). The admissibility of evidence in a federal criminal prosecution is governed by federal, not state, law. *United States v. Beals*, 698 F.3d 248, 263 (6th Cir. 2012). That includes application of the exclusionary rule. *United States v. Wright*, 16 F.3d 1429, 1434 (6th Cir. 1994).

Traffic stops are one exception to the warrant requirement: they are routine operations that may be conducted without a warrant, similar to a *Terry*[3] stop. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). The stop may last no longer than necessary to address the traffic violation that warranted the stop and attend to related safety concerns. *Id.* However, while the car is stopped, the officer may inquire into matters unrelated to the justification of the traffic stop, so long as those inquiries do not measurably extend the duration of the stop. *Muehler v. Mena*, 544 U.S. 93, 100-01 (2005). And officers may use a well-trained narcotics-detection dog during a traffic stop without infringing on any

---

[3] *Terry v. Ohio*, 392 U.S. 1 (1968).

constitutionally protected privacy interests, again as long as the officers do not improperly extend the length of the traffic stop to enable the dog sniff to occur. *Illinois v. Caballes*, 543 U.S. 405, 408-9 (2005). Further, during the traffic stop, the officer may order the driver to get out of the car. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977). The officer may do so "[e]ven without a reason to be suspicious" of the driver, to ensure his safety during the encounter. *United States v. Lash*, 665 F. App'x 428, 431 (6th Cir. 2016).

In *Lash*, defendant Richard Lash was stopped for failing to signal a turn. *Id.* at 429. Lash told the officers that he was driving a rental car he had borrowed from his girlfriend. *Id.* Officers performed a routine traffic stop: they obtained Lash's driver's license, learned that it was valid and that he had no outstanding warrants, and returned to the vehicle to return the license and let Lash go. *Id.* But when the officers were about to end the stop, one officer noticed a plastic bag sticking out from under Lash's leg. *Id.* The investigating officer then asked Lash for the rental-car agreement, in part to create time and opportunity to investigate further. *Id.* at 429-30. When Lash leaned over to get the rental agreement, the officer saw what appeared to be the butt of a gun in the plastic bag, so he asked Lash to step out of the vehicle. *Id.* at 430. Lash refused, put the car in drive, and fled. *Id.* He lost control of the vehicle and was arrested. *Id.* The officers searched his car and located a firearm. *Id.* He was later charged with being a felon in possession of a firearm and moved to suppress the evidence from the search of the vehicle, arguing that the traffic stop had been unreasonably extended. *Id.*

The Sixth Circuit disagreed, holding that the officers "had a legitimate explanation for detaining Lash further at each step along the way." *Id.* The officers were permitted to check

6

the rental-car agreement because it was a routine, ordinary inquiry within the scope of *Rodriguez. Id.* at 430-31. And, following *Mimms*, the officers could ask Lash to step out of the vehicle. *Id.* at 431. The Court explained that the traffic stop did not end when the officer returned to Lash's car to return his driver's license: at that point, the officer had not written a ticket, issued a warning, returned the license, or told Lash he would do any of those things. *Id.* "All objective indicators show[ed] that the stop had not ended," so the request to see the rental agreement was reasonable. *Id.* The Court also noted that the officer's alleged motivation—to extend the traffic stop—was irrelevant. *Id.* (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). The Circuit Court held that there had been no constitutional violation, and that the evidence was admissible. *Id.*

Separately, to search a car, its trunk, and/or its contents, officers must have probable cause to believe that the car contains evidence of some wrongdoing. *Carroll v. United States*, 267 U.S. 132 (1925). The probable cause determination must be based on objective facts that could justify the issuance of a warrant by a magistrate. *United States v. Ross*, 456 U.S. 798, 825 (1982). Probable cause is a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Probable cause exists when, under the totality of circumstances, there is a fair probability that evidence of a crime will be found in a particular place. *Id.* at 238; *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001) (quoting *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991)). "A positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance." *United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994).

7

## III.

The motion presently before the Court requires a brief recitation of the testimony presented at the May 11, 2020 hearing, and the credibility of Detective Woollam's testimony. Detective Woollam testified to the facts as outlined above, some of which are not memorialized in any contemporaneous writing. The parties focus on three such facts, so the Court will as well: (1) that Whitley was counting a wad of cash as he exited 5828 Ridgebrook; (2) that Whitley engaged in a quick transaction at 5986 Ridgebrook; and (3) that Detective Woollam was acting on information from a confidential informant that heroin was being sold out of the 5828 Ridgebook house. First, the Court finds Detective Woollam's testimony about the "wad of cash" credible, particularly since it is corroborated by the finding of over $7,600 in the center console of Whitley's vehicle. Second, the Court finds that Detective Woollam's testimony about observing an interaction at 5986 Ridgebrook is credible. However, that testimony was limited to observing Whitley speak to a black male for 20 to 25 seconds. There is no testimony that a hand-to-hand exchange or any type of transaction took place. Thus, the interaction is of limited value: it may be indicative of some relationship involving drugs, but it is far from proof of such a relationship. Finally, Detective Woollam's testimony about the confidential informant is of limited value to the Court. The informant was new to Detective Woollam, and there was no testimony or evidence presented to indicate that the informant had been previously reliable or that the tipster's information had been corroborated. Thus, the tip about the 5828 Ridgebook house being a source of heroin dealing merely brought Detective Woollam to his surveillance post, from which his observation of Whitley with the wad of cash led to further investigative steps.

With that in mind, the Court finds that the police actions during the traffic stop were reasonable at every stage. At oral argument, Whitley conceded that the initial traffic stop by Officer Turmell was acceptable. Whitley had violated the Michigan Vehicle Code by failing to stop at a private drive, which justifies the initial stop. MCL § 257.652; *Rodriguez*, 575 U.S. at 354. During the traffic stop, Officer Turmell was permitted to ask Whitley questions about the digital scale he observed on Whitley's lap. The scale was in plain view, and the questions Officer Turmell posed to Whitley did not elongate the traffic stop. *See Muehler,* 544 U.S. at 100-01.

Whitley makes essentially the same argument that was presented to the Sixth Circuit in *Lash*, arguing that the traffic stop ended and an improper narcotics investigation began when Officer Turmell went to his vehicle and spoke to Detective Woollam. However, as in *Lash,* Officer Turmell had not yet checked the status of Whitley's driver's license, written a ticket, issued a warning, or returned Whitley's driver's license. *See Lash*, 665 F. App'x at 431. There are no facts in the record that indicate that the traffic stop ended at this point. Further, as in *Lash* and *Whren,* the allegation that officers were investigating Detective Woollam's narcotics suspicion is irrelevant. *See id.* Therefore, the stop remained a routine traffic stop when the officers returned to Whitley's window, and under *Mimms*, the officers were permitted to ask Whitley to exit the vehicle during that routine traffic stop. *See id.* The Court finds that the officers' requests for Whitley to exit his vehicle were lawful.

At that point, Whitley's own actions in refusing to exit the vehicle elongated the traffic stop beyond the time typically necessary to affect its purpose, so the proverbial clock stopped running for the officers. The time Whitley sat in the vehicle arguing with the officers is

9

attributable to him and his decisions, not the officers or their actions. Because the time that Whitley remained in the vehicle is not fairly attributable to police conduct, the time he remained in the vehicle was not an inappropriate extension of the traffic stop. In turn, the officers did not elongate the traffic stop to allow the K9 unit to reach the scene or to perform the K9 sniff. In fact, as Officer Sanderson testified, he and his canine Azar had to wait about ten minutes after their arrival to perform the sniff of the car. The sniff was performed shortly after Whitley exited the vehicle, so it was done in a timely manner.

The K9 dog alerted positive for narcotics. That alone provides probable cause for officers to search the vehicle for controlled substances. *Diaz*, 25 F.3d at 393-94. Thus, the evidence obtained from the search is admissible. And because there was no constitutional violation, there is no "fruit of the poisonous tree," and Whitley's post-*Miranda* statements are admissible evidence.

The Court appreciates that Whitley, through his counsel, brings arguments about the unsettled nature of Michigan law concerning officer authority to make inquiries regarding reasonable suspicion of marijuana possession during traffic stops, now that marijuana in limited quantities is legal for recreational use in the state. *See* Michigan Regulation and Taxation of Marijuana Act, MCL § 333.27951 *et seq.* However, given the finding that the officers had authority to ask Whitley to exit the car and did not prolong the traffic stop, the Court's analysis need not go further. Accordingly, the Court need not address the arguments raised by counsel at this juncture.

## IV.

In conclusion, the Court finds that the investigating officers were permitted to ask Whitley to exit his vehicle as part of the ongoing traffic stop. While Whitley refused to do so, the traffic stop was elongated through no fault of the officers. Therefore, the K9 sniff, while performed over 15 minutes after the stop began, was constitutional. The positive K9 hit provided probable cause to search the vehicle, so the evidence obtained from that search is admissible, as are Whitley's post-*Miranda* statements. For these reasons, Defendant's motion to suppress (ECF No. 24) is **DENIED**.

**IT IS SO ORDERED**.

Date:  May 20, 2020                                         /s/ Paul L. Maloney
                                                                       Paul L. Maloney
                                                                       United States District Judge

11